# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **GREENBRIER HOSPITAL, LLC** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 17-6420** |
| **ALEX M. AZAR, in his official capacity as Secretary of Health and Human Services** | * | **SECTION "L" (3)** |

## ORDER AND REASONS

Before the Court are cross-motions for summary judgment. Having considered the parties' briefs and the applicable law, the Court now issues this Order and Reasons.

### I. BACKGROUND

Plaintiff Greenbrier Hospital, LLC ("Greenbrier"), a Medicare-certified inpatient psychiatric facility in Covington, Louisiana, seeks judicial review of a decision from the Administrator of the Centers for Medicare and Medicaid Services ("CMS"). Greenbrier contends that the Administrator applied the wrong legal standard in determining the appropriate reimbursement rate for its cost report beginning on January 1, 2008.

**1. Structure of Medicare Reimbursement**

CMS is the operating component of the Department of Health and Human Services charged with administering the Medicare program. CMS pays hospitals participating in the Medicare program through a fiscal intermediary or Medicare Administrative Contractor (MAC). Inpatient psychiatric facilities (IPFs) like Greenbrier are required to file annual cost reports (an accounting of its operating and capital-related costs that should be allocated to Medicare) with their responsible MAC. The cost report is reviewed and subject to audit by the MAC, which then issues a Notice of Program Reimbursement (NPR) reflecting the final determination of the total amount

1

due to the provider. The MAC's decision may be appealed to the Provider Reimbursement Review Board (PRRB), and the Administrator of CMS may, at its own option, review the PRRB's decision.

## 2. Regulatory Background

The Tax Equity and Fiscal Responsibility Act ("TEFRA") of 1982 exempted IPFs from the payment methodologies that applied to ordinary hospitals. IPFs, therefore, were paid on a "reasonable cost" basis. In 1999, Congress passed the SCHIP Balanced Budget Reform Act, which required the Secretary to develop and implement a per diem prospective payment system for IPFs ("IPF-PPS"). The Secretary issued a final rule establishing the IPF-PPS in November 2004. The final rule provided for a three-year transition period, during which the IPF would receive blended payments comprised of an increasing percentage of the PPS rate and a decreasing percentage of the TEFRA rate each year.

Due to a clerical error, when CMS issued the final rule for the transition period, it incorrectly used summertime dates. The rule published on November 15, 2004 provided:

> **§ 412.426    Transition period.**
> *(a) Duration of transition period and composition of the blended transition payment.* Except as provided in paragraph (c) of this section, for cost reporting periods beginning on or after January 1, 2005 through **June 30, 2008**, an inpatient psychiatric facility receives a payment comprised of a blend of the estimated Federal per diem payment amount, as specified in § 412.424(c) and a facility-specific payment as specified under paragraph (b).
> > (1) For cost reporting periods beginning on or after January 1, 2005 and on or before **June 30, 2006**, payment is based on 75 percent of the facility-specific payment and 25 percent is based on the Federal per diem payment amount.
> > (2) For cost reporting periods beginning on or after **July 1, 2006** and on or before **June 30, 2007**, payment is based on 50 percent of the facility-specific payment and 50 percent is based on the Federal per diem payment amount.
> > (3) For cost reporting periods beginning on or after **July 1, 2007** and on or before **June 30, 2008**, payment is based on 25 percent of the facility-specific payment and 75 percent is based on the Federal per diem payment amount.

> (4) For cost reporting periods beginning on or after **July 1, 2008**, payment is based entirely on the Federal per diem payment amount.

69 Fed. Reg. 66922, 66980 (emphasis added).

To fix this clerical error, CMS published a "correction of final rule" in the Federal Register on April 1, 2005. The purpose of the correction was to "conform[] the regulation text to the actual policy" that was "clear from the discussion in the preamble" of the rule in the Federal Register publication. 70 Fed. Reg. 16724, 16726. The correction made the following changes:

> **§ 412.426 [Corrected]**
> a. In paragraph (a) introductory text, "June 30, 2008" is corrected to "January 1, 2008"
> b. In paragraph (a)(1), "June 30, 2006" is corrected to "January 1, 2006"
> c. In paragraph (a)(2), "July 1, 2006" is corrected to "January 1, 2006" and "June 30, 2007" is corrected to "January 1, 2007"
> d. In paragraph (a)(3), "July 1, 2007" is corrected to "January 1, 2007" and "June 30, 2008" is corrected to "January 1, 2008"
> e. In paragraph (a)(4), "July 1, 2008" is corrected to "January 1, 2008"

70 Fed. Reg. 16724, 16728.

With the corrections, (a)(3) and (a)(4) would read as follows:

> (a)(3) For cost reporting periods beginning on or after January 1, 2007 and **on** or before **January 1, 2008**, payment is based on 25 percent of the facility-specific amount and 75 percent is based on the Federal per diem payment amount.

> (a)(4) For cost reporting periods beginning **on** or after **January 1, 2008**, payment is based entirely on the Federal per diem payment amount.

Under the corrected final rule, a cost report beginning "on" January 1, 2008 falls under both (a)(3), providing for 25% TEFRA and 75% Federal per diem, and (a)(4), providing for 100% Federal per diem.

To make matters more confusing, a second clerical error was discovered. The Office of the Federal Register failed to include the corrected version of (a)(4) in the 2005 edition of the Code of

3

Federal Regulations ("CFR"). So, unlike the corrected final rule published in the Federal Register, the 2005 CFR did not include the overlapping use of January 1, 2008; thus, a cost report beginning on January 1, 2008 would only fall under (a)(3):

(a)(3)  For cost reporting periods beginning on or after January 1, 2007 and on or before **January 1, 2008**, payment is based on 25 percent of the facility-specific amount and 75 percent is based on the Federal per diem payment amount.

(a)(4)  For cost reporting periods beginning on or after **July 1, 2008**, payment is based entirely on the Federal per diem payment amount.

*See* 42 C.F.R. § 412.426 (2005).

In an attempt to clarify this matter, CMS later published tables in the Federal Register in 2006, 2007, and 2008 (the "Preamble Tables") that showed that cost reports beginning *on* January 1, 2008 would be reimbursed at the full Federal per diem amount, rather than the third-year transition blend:

TABLE 1.—IPF PPS FINAL RULE TRANSITION BLEND FACTORS

| Transition year | Cost reporting periods beginning on or after | TEFRA rate percentage | IPF PPS Federal rate percentage |
|---|---|---|---|
| 1 | January 1, 2005 | 75 | 25 |
| 2 | January 1, 2006 | 50 | 50 |
| 3 | January 1, 2007 | 25 | 75 |
|   | January 1, 2008 | 0 | 100 |

CMS reiterated this policy several times. *See* R. Doc. 23 at 261 (Change Request 3541, issued December 1, 2004); R. Doc. 23 at 275 (Change Request 5619, issued May 25, 2007, stating "The IPF PPS transition blend percentage for cost reporting periods beginning on or after January 1, 2007, but *before* January 1, 2008, is 75 percent PPS and 25 percent TEFRA. The transition blend percentage for cost reporting periods beginning *on* or after January 1, 2008 is 100 percent PPS."); R. Doc. 23 at 298 (CMS's Provider Reimbursement Manual, issued August 2006, instructing IPF providers to enter "75 percent for cost reporting periods beginning on or after January 1, 2007 *but*

4

*prior to* January 1, 2008" and "100 percent [i.e., full Federal per diem] … for cost reporting periods beginning *on* or after January 1, 2008") (emphasis added); R. Doc. 23 at 282 ("The transition blend percentage for cost reporting periods beginning *on* or after January 1, 2008 is 100 percent PPS"); R. Doc. 23 at 288 ("For cost reporting periods beginning *on* or after January 1, 2008, payments will be 100 percent PPS").

CMS formally revised the regulation as published in the CFR in 2011. The 2011 Final Rule revised (a)(3) so that year three of the transition period applied only to cost reports beginning *before* – not on – January 1, 2008. 76 Fed. Reg. 4998, 5022 (January 27, 2011). The 2011 Final Rule also changed the erroneous "July 1, 2008" language in (a)(4) to "January 1, 2008" to reflect the 2005 Federal Register correction. Thus, under the 2011 Final Rule, a cost report beginning on January 1, 2008 could only be subject to the full Federal per diem amount under (a)(4). CMS explained:

> This correction does not represent a change in policy. Rather, it is a correction to conform the regulation text to our policy, which was established in our final rule that appeared in the Federal Register on November 15, 2004 (69 FR 66980) (which was subsequently corrected on April 1, 2005 (70 FR 16729)). It is clear that the current regulation text is incorrect … Because our regulation text does not accurately reflect our actual policy, we are proposing this correction.

76 Fed. Reg. 26432, 26460 (May 6, 2011).

### 3. Procedural History

The issue here is whether Greenbrier is eligible for the third-year transition rate for its cost report beginning on January 1, 2008. The MAC relied on the Preamble Tables and reimbursed Greenbrier at the 100% Federal per diem rate. Greenbrier sought review from the PRRB, which held that Greenbrier should have been reimbursed according to the third-year transition rate, which was 75% Federal per diem and 25% TEFRA.

5

The CMS Administrator, however, elected to review the PRRB's decision. The Administrator reversed the PRRB and held that (1) Greenbrier should have been reimbursed at the full Federal per diem rate and (2) the 2011 amendment to § 412.426 did not effect a substantive change and was not retroactive rulemaking:

> Taken as a whole, the language describing the IPF-PPS transition served as notice of CMS' policy established in the November 15, 2004 IPF PPS final rule, even if technical inconsistencies existed between the regulation text and the preamble language before technical corrections were issued on May 6, 2011 … The effect of the May 2011 correcting amendment was not to substantively change the final rule, but rather to correct the inadvertent error of the regulatory text so that it was consistent with CMS' intent as expressed in the preamble to the rule.

The Administrator's decision constitutes the final administrative decision issued by the U.S. Department of Health and Human Services.

## II. PRESENT MOTIONS

### 1. Greenbrier's Motion for Summary Judgment

Greenbrier moves for summary judgment reversing the Administrator's decision or, alternatively, vacating the decision and remanding the action for further proceedings. Greenbrier argues that the Administrator erroneously looked beyond the plain meaning of the regulation in effect when the disputed report was submitted. The regulation, as published in the CFR at the time, stated that cost reports beginning on January 1, 2008 were entitled to a third-year rate. Greenbrier argues that the Administrator cannot apply a self-described "policy" that was inconsistent with the plain text of an unambiguous regulation. Greenbrier further argues that the agency cannot retroactively apply the 2011 amended language to the disputed cost report.

### 2. CMS's Opposition/Cross Motion for Summary Judgment

CMS moves for summary judgment dismissing Greenbrier's claims with prejudice, arguing that the regulation was ambiguous and the Administrator reasonably interpreted its own

ambiguous regulation in denying Greenbrier the third-year transition rate for the disputed report. CMS contends that the corrected rule published in the 2005 Federal Register was ambiguous, because it used January 1, 2008 as both a possible trigger date for a third-year blended rate under (a)(3) and a mandatory date for a 100% Federal per diem rate under (a)(4), and the Administrator reasonably interpreted and applied the regulation.

### III.  LAW AND ANALYSIS

Judicial review of CMS's decision is limited by the Administrative Procedure Act, 5 U.S.C. § 706, ("APA"). Under the APA, the Court must uphold an agency's actions, findings, and conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017) (quoting *Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*, 374 F.3d 362, 366 (5th Cir. 2004)). The Fifth Circuit "will defer to an agency's reasonable interpretation of its own regulations when the text of the regulation is ambiguous." *Delek Refining, Ltd. v. OSHRC*, 845 F.3d 170, 175 (5th Cir. 2016). "In situations in which the meaning of regulatory language is not free from doubt, the reviewing court should give effect to the agency's interpretation so long as it is reasonable," and it "sensibly conforms to the purpose and wording of the regulations." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 151 (1991) (alterations omitted). If the regulation is not ambiguous, no deference is owed. *Delek Refining, Ltd.*, 845 F.3d at 175.

Greenbrier primarily relies on the erroneous version of the regulation published in the CFR to argue that the regulation is unambiguous and no deference is owed. Publication in the Federal Register "creates a rebuttable presumption … that the copy contained in the Federal Register is a

7

true copy of the original." 44 U.S.C. § 1507. The CFR "is the permanent publication of rules but publication there does not affect the validity of the rule so long as the rule was originally contained in the Federal Register. The CFR in each volume explains that the CFR is part of the total Federal Register System and the CFR and Federal Register must be used together." Charles Alan Wright & Charles H. Koch, Jr., 32 Federal Practice & Procedure § 8185 (2006). The Court declines to apply the erroneous text published in the CFR that, due to a clerical error, differed from the text of the corrected final rule published in the Federal Register.

Under the corrected final rule published in the Federal Register, a cost report beginning on January 1, 2008 fell under both (a)(3)'s third-year rate *and* (a)(4)'s 100% Federal per diem rate. The two are mutually exclusive – a provider cannot receive both a third-year rate and a 100% Federal per diem rate for the same cost report. Because January 1, 2008 was included in both (a)(3) and (a)(4), the regulation is ambiguous.

The Administrator reasonably interpreted and applied the ambiguous regulation in denying Greenbrier the third-year rate. "It is well established that an agency's interpretation need not be the only possible reading of a regulation – or even the best one – to prevail." *Decker v. Northwest Environmental Defense Center*, 568 U.S. 597, 613 (2013). It need only be one that is not "plainly erroneous or inconsistent with the regulation." *Id.*

Although the corrected final rule used January 1, 2008 as both a trigger for a third-year rate under (a)(3) and a trigger for 100% Federal per diem payment in (a)(4), CMS published Preamble Tables in the Federal Register clarifying that a cost report beginning on or after January 1, 2008 would be subject to 100% Federal per diem on three occasions. *See* 71 Fed. Reg. 27040, 27042 (May 9, 2006); 72 Fed. Reg. 25602, 25603 (May 4, 2007); 73 Fed. Reg. 25709, 25711 (May

7, 2008). This policy was reiterated several other times in print, and these statements were promulgated for IPFs before Greenbrier submitted its disputed report.

*Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13 (D.D.C. 2011) also involved a discrepancy between a statement of agency policy in the Federal Register and technical inconsistencies in the language published in the CFR. There, the court held that "the preamble language serves as evidence of CMS's contemporaneous understanding of the final rule, even if technical inconsistencies existed between the final rule language and the preamble language before the correcting amendment was issued." *Id.* at 25; *see also Wiggins Bros., Inc. v. Dep't of* Energy, 667 F.2d 77 (Temp. Emer. Ct. App. 1981) (Preamble to a regulation "should be considered in construing the regulation and determining the meaning of the regulation"). The Administrator thus reasonably relied on the Preamble Tables and other clear statements of agency policy in interpreting and applying the ambiguous regulation.

### IV. CONCLUSION

Because the Administrator reasonably interpreted and applied its own regulation in denying Greenbrier the third-year transition rate for its January 1, 2008 cost report, Greenbrier's motion for summary judgment, R. Doc. 19, is hereby **DENIED**. CMS's cross-motion for summary judgment., R. Doc. 24, is hereby **GRANTED**, and Greenbrier's claims are dismissed with prejudice.

New Orleans, Louisiana, this 25th day of February, 2019.

_____
UNITED STATES DISTRICT COURT JUDGE

9